## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**DENISE ROSADO**,

     Plaintiff,

     v.

**COMMISSIONER OF SOCIAL
SECURITY**,

     Defendant.

**Civil No. 20-1621 (BJM)**

### OPINION AND ORDER

Denise Rosado ("Rosado") seeks review of the Commissioner's finding that she is not disabled and thus not entitled to disability benefits under the Social Security Act (the "Act"). 42 U.S.C. § 423. Rosado contends that the Administrative Law Judge's ("ALJ") step five non-disability determination was not supported by substantial evidence, particularly as to the ALJ's findings based on Rosado's English language illiteracy and the ALJ's reliance on the Vocational Expert's ("VE") testimony. ECF Nos. 1, 15, 19. The Commissioner opposed. ECF No. 18. This case is before me on consent of the parties. ECF Nos. 7-10. After careful review of the administrative record and the briefs on file, and for the reasons set forth below, the Commissioner's decision is **REMANDED**.

### STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v.*

*Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, she is conclusively presumed to be disabled. If not, the ALJ assesses the claimant's residual functional capacity ("RFC")[1] and determines at step four whether the impairments prevent the claimant from doing the work she has performed in the past. If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e). If she cannot perform this work, the fifth and final

---

[1] An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1).

step asks whether the claimant is able to perform other work available in the national economy in view of her RFC, as well as her age, education, and work experience. If the claimant cannot, then she is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving that she cannot return to her former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy that the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that her disability existed prior to the expiration of her insured status, or her date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the pertinent parts of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript.

Rosado was born on January 18, 1971, has an eleventh-grade education, is unable to communicate in the English language but does so in the Spanish language, and worked in customer service and as an accounting assistant from 2008 to 2013. Rosado applied for disability insurance benefits on September 20, 2016, at age 45, claiming to have been disabled since October 1, 2013 (onset date) at age 42[2] due to carpal tunnel syndrome and cervical and lumbar spine pain. She last met the insured status requirements on December 31, 2018 (date last insured). Social Security Transcript ("Tr.") 21, 24, 55, 504-505, 754-755, 796-797.

***Treating Physicians – Physical***

**State Insurance Fund ("SIF")**

Rosado received treatment under the auspices of the SIF due to a work accident. Tr. 802. On September 30, 2010, Rosado complained of injury due to excessive exertion while lifting heavy boxes. Her back, neck, shoulder, and left hand and arm hurt, with pain radiating to her right leg. The pain worsened when lying down. Rosado was observed walking with difficulty. Her pain level

---

[2] Rosado was considered to be a younger individual (Tr. 30, 504), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c).

was between one and three on a scale of ten. Her health history reflected that she had undergone right knee surgery (eight screws).  Tr. 83-84, 898-899.

In October 2010, a cervical spine x-ray showed minimal deviation of the cervical spine, a muscle spasm, chronic narrowing at the C5-C6 disc space, and slight spondylolisthesis at the same level. Tr. 91, 906. A lumbosacral spine x-ray showed some deviation. Tr. 92, 907. A left shoulder x-ray showed inflammatory changes. Tr. 93, 908. A left-hand x-ray showed no acute bony or joint pathology. Tr. 94, 908. Rosado was administered a Kenalog injection for a cervical/lumbar spasm and prescribed medications. Tr. 152, 168. An electromyography nerve conduction velocity study showed radiculitis in her right leg at the L5-S1 level. Tr. 105, 486. A physiatrist referred Rosado to physical therapy. Tr. 197-198, 1010.

Physical therapy notes from December 2, 2010, indicate that Rosado was diagnosed with chronic cervical lumbosacral myositis. Rosado reported feeling chronic and constant pain in her cervical, dorsal, and lumbar/sacral area which radiated to her right leg and having no strength in her hands. Rosado further reported that the pain interfered with her ability to sit, stand, walk, and do household chores. She was observed walking without difficulty but with pain. Her gait pattern was normal. Muscle spasms in the upper trapezius and paravertebral area were severe. Muscle tone was normal. Sensation was not affected. Rosado was tested for range of motion and muscle strength. Her postural responses to sitting, standing, and walking were good. Tr. 85-87, 900-902. Physical therapy notes from December 10, 2010, indicate that Rosado reported mild relief. Tr. 88, 903. Dr. Marita Flaz noted that physical therapy was not helping, referred Rosado for MRI studies, and prescribed medications (Cataflam, Flexeril, and Neurontin). Tr. 99, 101, 111, 113.

In February 2011, a cervical spine MRI revealed straightening of the normal curvature, misalignment with grade I retrolisthesis of C4 on C5, evidence of generalized osteophyte formations and disc desiccation, narrowing of the disc space C5-C6 level, and mild hypertrophy of the apophyseal joints. The MRI also showed a moderate-sized posterior disc bulge at the C4-C5 level and a small central subligamentous disc herniation, and central canal stenosis. There was a large posterior bulge at the C5-C6 level and a central disc herniation, cord compression, central canal stenosis and bilateral neural foramina stenosis. A mild posterior disc bulge with mild central canal stenosis was also present at the C6-C7 level. Tr. 108, 1052. The lumbosacral spine MRI revealed evidence of generalized osteophyte formations; minimal disc desiccation at L4-L5  and L5-S1 level; grade I retrolisthesis of L5 on S1; mild central and lateral canal stenosis secondary to

a posterior disc bulge at the L4-L5 level and hypertrophic apophyseal joints; and diffuse posterior disc bulge and a small central disc herniation, obliteration of the epidural fat, and central canal stenosis at the L5-S1 level, but with minimal bilateral neural foramina stenosis. Tr. 1054.

In March 2011, an electromyography nerve conduction velocity study of the upper extremities showed no evidence of cervical radiculitis or carpal tunnel syndrome. Tr. 103-104, 485.

In April and July 2011, Dr. Oscar Benítez, neurologist, found no neurological deficit. Dr. Benítez did not recommend a chiropractor for Rosado and referred her for re-evaluation with cervical/lumbar MRI, evaluation by a hand surgeon and a neurosurgeon, and follow-up with a rheumatologist or neurologist. Tr. 96, 101, 485.

Dr. Flaz's June 2011 notes indicate that Rosado was diagnosed with cervical and lumbosacral sprain, right L5-S1 radiculopathy, and mild right carpal tunnel syndrome. Tr. 95. October and November 2011 notes indicate that Rosado continued with cervical and lumbosacral pain, with no significant changes in her cervical and lumbosacral condition. She was pending an evaluation by a neurosurgeon. She was also logical, coherent, and not suicidal or hallucinating. Tr. 102, 109, 147.

The record also contains a series of electromyography examinations of the upper and lower extremities from 2010 and 2011, indicating L5/S1 radiculopathy. Tr. 103-106, 918-919.

**Family Medicine Group**

October 2011 notes indicate Rosado felt severe pain in her right arm. She was referred to a cardiologist and a gynecologist. Tr. 117.

June 2012 notes indicate that Rosado had no pain complaints related to her musculoskeletal system. Neck examination was normal, with full range of motion. Her feet presented pedal pulse. She was referred to a gynecologist for pelvic pain and unspecified menstrual disorders and treated throughout 2013 for urinary tract infection. Tr. 117-188.

September 2013 notes indicate left foot toe numbness associated with an ankle sprain, and a tarsal tunnel syndrome diagnosis. Pain was a four on a scale of ten. Tr. 118.

From November 2014 to January 2015, Rosado was diagnosed with hypertension, arthropathy, lumbago, lumbar myositis, and anxiety. Blood tests, x-rays, urinalysis, and a complete metabolic panel were ordered. Medications and a paralumbar injection with Kenalog and Xylocaine, and Betadine. Weight loss and diet were recommended. Tr. 118-121.

Notes from October 2016, summarize Rosado's conditions and vital signs between 2011 to 2015. Tr. 115-117.

In November 2018, Rosado was diagnosed with major depression, recurrent, moderate without psychotic features and unspecified anxiety. Chronic pain was listed as a cause of her depression. She was referred to INSPIRA for psychiatric therapy and to a psychologist for cognitive-behavioral and neurofeedback therapy. Rosado agreed to treatment and presented a fair prognosis. Tr. 367, 1059.

Rosado also informed being treated by Dr. Sandra Maldonado of the Family Medical Group from 2009 to 2016 for all her conditions. Rosado submitted a letter on October 28, 2016, indicating that, after duly requesting her record, it was not found, and she was therefore unable to provide a copy. Tr. 71-72, 801, 820-821. Dr. Maldonado referred Rosado to physiatrist Dr. Nalix Garcia for low back pain treatment. Tr. 139, 799-800.

**Dr. Nálix García Catalán**

At initial evaluation in February 2014, Rosado informed she had been suffering low back pain for a year. The pain would start after prolonged sitting and standing and long-distance driving, resulting in a stabbing and burning sensation of pain that radiated to the left leg. On examination, Rosado had tenderness in the lumbosacral region and decreased sensation in the left L5-S1. She had full range of motion, normal tone, and no atrophy or edema or spine deformity. Straight leg raise test was positive to the left. Gait was guarded. Rosado was diagnosed with thoracic or lumbosacral neuritis or radiculitis and lumbago. She was injected with Kenalog in the left lumbar, sacral and paraspinal muscles. She was also prescribed medications and underwent eight physical therapy sessions to decrease lumbosacral pain. Tr. 134-135, 138.

In March 2014, Rosado "was much better after PT." Tr. 136. Rosado was to continue with medications (Cyclobenzaprine, Neurontin, Naproxen Sodium) and exercise at home. Tr. 137.

**University of Puerto Rico, Medical Sciences Campus - Gynecology**

In 2014, Rosado was diagnosed with irregular menstrual cycle, dysmenorrhea, and menopausal symptoms. Tr. 1182-1183. In 2015, she was diagnosed and started treatment for a left ovarian cyst and related pain. Tr. 121, 1057, 1174-1177, 1179, 1181. A December 2015 CT scan revealed evidence of a possible right ovarian cyst. Tr. 1053.

February 2015 notes indicate that in 1986 Rosado underwent patellar surgery (notes don't indicate which knee) and that she had carpal tunnel syndrome. Tr. 1182-1183. March 2015 notes

indicate that Rosado had no cardiac, respiratory, renal, urinary, gastrointestinal, endocrine, hematologic, musculoskeletal, or psychiatric complaints. Her extremities had normal appearance and full range of motion, with no swelling or enlarged or tender joints. Tr. 1179-1180.  June 2015 notes indicate that complained of coccygeal pain, mostly when sitting or lying down, and pressure-like pelvic pain. Rosado was tolerating diet and ambulation. Tr. 1174-1175.

**Dr. Luz López Bonet**

Dr. López, general practitioner, treated Rosado from 2016 to 2019 for hypercholesterolemia, intervertebral disc disorders with radiculopathy in the lumbosacral region, cervical disc displacement and degeneration, left knee pain and left knee effusion, breast neoplasm, impaired fasting glucose, hypertensive heart disease without heart failure, headache, major depressive disorder, recurrent severe without psychotic features, anxiety disorder, other breast symptoms, and primary amenorrhea (absence of menstruation). Rosado was also screened for malignant neoplasm of colon and breasts. Treatments included medicines and dietary and exercise counseling. Her body mass index ("BMI") was 29.0-29.9. Tr. 229-333, 352-357, 800, 826, 1192-1197, 1243-1279.

In May 2016, Rosado was referred to a gastroenterologist for abdominal pain, bloating, constipation, and occasional bleeding. Tr. 1067, 1069. She was initially examined in December 2016 at the University of Puerto Rico Medical Sciences Campus, and a March 2017 colonoscopy revealed small internal hemorrhoids and a spastic colon.  If treatment with fiber and Miralax failed, she would start antispasmodic medications. Tr. 1051, 1065, 1163-1173.

Arterial and vein studies of the lower extremities performed in December 2017 were normal. Tr. 1047, 1049.

Rosado felt left knee pain with no injury or trauma, and a left knee x-ray taken December 2017 showed mild narrowing of the medial tibiofemoral and patellofemoral joint spaces on basis of degenerative joint disease, in contrast to one taken September 2016 which showed no abnormalities. Tr. 486, 1241-1242. In February 2018, Dr. López diagnosed chronic left knee pain, referred Rosado to a rheumatologist, and instructed Rosado to reduce weight so as not to worsen the left knee pain and to try yoga class. Tr. 289, 1046. Dr. Ruth Fred, rheumatologist, examined Rosado in May and September 2018 and diagnosed left knee pain/effusion and knee osteoarthritis, noting a surgical history of the right knee due to trauma, and prescribed a knee injection and medications. Tr. 1060, 1064, 1155-1162. In May 2018, an aspiration was performed on the left

knee to remove synovial fluid. Tr. 1161. Dr. López's May 2018 notes indicate that there was no improvement on knee pain after injection. Tr. 285. Dr. Fred's September notes indicate that Rosado "has no improvement of pain with injection or NSAIDs. She has not taken PT or ortho evaluation. She does not recall trauma." Tr. 1155.

A September 2018 orthopedic note from the University of Puerto Rico, Medical Sciences Campus, states that the patient with left knee pain showed no improvement of symptoms. Tr. 1058. Dr. López noted in November 2018 that Rosado complained that the knee pain had worsened and that she was not complying with medical treatment and regimen. Dr. López oriented Rosado as to dieting, exercise (recommended aquarobics), and mental health management. Tr. 1072,1245.   A left knee MRI dated November 2018 showed a small joint effusion but an otherwise unremarkable study. Tr. 1041.

In January 2019, Dr. López referred Rosado to orthopedic surgeon Dr. Richard Valentín Blasini, who evaluated Rosado for low back pain, osteoarthritis, left knee effusion and pain. Tr. 364-365, 1235-1236, 1238-1239, 1278, 1281. A February 2019 lumbosacral spine x-ray showed straightening of the lumbar lordosis, compatible with lumbar paravertebral muscle spasm, and the L5-S1 disc interspace was moderately narrowed. The pelvis and bilateral hips x-ray showed that the right hip coxofemoral articular interspace was moderately narrowed. Tr. 1237. A June 2019 lumbar spine MRI showed early discogenic disc disease changes at L3-L4, L4-L5, and L5-S1 levels with small disc bulge seen at the L4-L5 and L5-S1 levels. At the L5-S1, a hyperintense zone was seen at the posterior annulus in favor of annular fissure (partial annular tear). Tr. 1273, 1291.

**INSPIRA**

Notes from November 2018 through July 2019 indicate that Rosado received cognitive behavioral therapy and psychiatric treatment for adjustment disorder with mixed anxiety and depressed mood. She had mood swings and feelings of sadness, anxiousness, irritability, and unease, and was concerned about her daily living situation (family and finances). She was cooperative and oriented in time, place, person, and situation. Her thought process was relevant, coherent, and logical. Her attention, concentration, insight, and judgment were adequate.  Tr. 391. Rosado was provided recommendations to achieve a better emotional stability and prescribed medications (Klonopin, Amitriptyline Hydrochloride). July 2019 notes indicate that Rosado felt fine ("I feel fine," Tr. 381) and had no symptoms related to depression and anxiety. Tr. 369-392.

***Procedural History***

      Rosado reported in a disability report dated September 23, 2016, that she could not speak, read, or understand English, and preferred Spanish. Tr. 795. A field office interviewer reported that Rosado was not observed with difficulty hearing, reading, breathing, understanding, concentrating, talking, or answering. Tr. 792-793.

      Rosado submitted two function reports, one in October 2016 for initial determination and one in January 2017 for reconsideration purposes, and a pain description questionnaire in January 2017. Collectively, these filings indicate that her conditions and severe and acute pain affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, use her hands, complete tasks, and concentrate. Lower back pain radiated to her left leg, and her feet and legs would go numb after prolonged sitting. Rosado reported being able to walk for fifteen to thirty minutes before needing to stop and rest for around five minutes. In January 2017, she reported being able to walk thirty to forty-minutes before needing to stop and rest for twenty to twenty-five minutes. Bending was painful. She went up and down stairs with difficulty. She could not kneel because then she wouldn't be able to get up. She had no strength in her hands and could not carry heavy objects. Her hands would also go numb. She would drop things. She could not properly hold her head up or down or raise her arms because of severe neck and shoulder pain. Tr. 63-78, 73-82, 812-819, 831-838, 847-848.

      Rosado used a non-prescribed cane for medical appointments and a walker for grocery shopping. She took Tramadol, Neurontin, and Relafen three times a day, which provided some relief but caused drowsiness, dizziness, tiredness, and trembling. Warm showers helped with the pain. She slept with pain because any position she assumed hurt her. She sat to put her pants on and wash her feet. Her daughter would help her shave her legs. When her conditions allowed, she would sweep small sections of the house slowly. She cooked simple meals daily that didn't require prolonged standing. She washed dishes daily. She did laundry once a week. Her daughter helped her with chores that required blending, such as cleaning the bathroom and mopping. She did not do house or yard work because the pain would get so severe that she could not walk. Her hobbies included watching television and reading, which she did while switching positions between sitting and lying down. She would go out two to three time a week, could drive and go out alone, and would go shopping for groceries about once a month. She socialized with others at church on Sundays and over the phone, and had no problems getting along with others, including authority

figures. She could pay attention, follow written and spoken instructions, and did not need help or reminders to take her medicines or go places. Her ability to handle money had not changed with her conditions. She handled stress by praying. *Id.*

Rosado's October 2016 work history report indicates that she worked at a mega store and at an office equipment and school supply from 2008 to 2013. Her duties as an accounting assistant included carrying, handling, and counting cash register money and making deposits to Wells Fargo. She would lift and carry money bags, up to ten pounds frequently. She would roll coins for change. She would walk for two hours in a workday, stand for two hours, sit for three hours, climb for half-an-hour, stoop for one hour, and handle/grab/grasp big objects for half-an-hour. She did not use machines, tools, or equipment, or write reports but did use technical knowledge or skills. She did not supervise people but was a lead worker. Tr. 55-56, 62, 805, 811.

As a customer service/salesperson, her duties included computer work, doing sales, carrying heavy boxes with school supplies from the warehouse to label and place them on shelves, xeroxing, calling customers, cleaning/sweeping/mopping and organizing areas. She would frequently lift up to fifty pounds. She would walk for five hours in a workday, stand for five hours, sit for half-an-hour, climb for three hours, stoop for four hours, crouch for one hour, kneel for one hour, and handle, grab, or grasp big objects for two hours. She used machines, tools, equipment, and technical knowledge and skills. She wrote reports. She did not supervise others but was a lead worker. Tr. 57, 62, 806, 811.

On November 10, 2016, Dr. Jose Cuebas assessed that Rosado could occasionally (cumulatively one-third or less of an eight-hour worday) lift and/or carry (including upward pulling) twenty pounds and ten pounds frequently (cumulatively more than one-third up to two-thirds), stand and/or walk with normal breaks for about six hours, sit with normal breaks for six hours, and push and/or pull (including operation of hand and/or foot controls) unlimitedly. Rosado could frequently climb ramps/stairs and ladders/ropes/scaffolds. She could frequently balance, kneel, and crawl. She could occasionally stoop (bend at the waist) and crouch (bend at the knees). Rosado had no manipulative, visual, communicative, or environmental limitations. Tr. 510-513.

The claim was initially denied on November 14, 2016, with a finding that Rosado retained a physical RFC for light work. Listing 1.04 was considered and Rosado was found to have a severe disorder of the back (discogenic and degenerative) that could reasonably be expected to produce pain but not the intensity, persistence, and functionally limiting effects she claimed. Vocational

Rule 202.16 (young illiterate or no English unskilled limited to light work) as a framework directed to a finding of not disabled as per Rosado's age, education, and RFC. Tr. 509, 512, 531.

Rosado requested reconsideration and did not claim worsening of her conditions. Tr. 519, 535, 825.

Dr. Cristina Ortiz reviewed the medical evidence and found on February 23, 2017, that the record showed no significant worsening that warranted additional limitations than those proposed at the initial level and agreed with the RFC assessment for light work. Tr. 520-525.

The claim was denied on reconsideration on February 24, 2017. The initial determination was affirmed as written. Tr. 51, 516, 520, 524, 536.

Rosado requested a hearing before an ALJ on March 17, 2017. Tr. 539. She did not claim changes to her existing physical or mental conditions or new conditions, or reported having new medical evidence to offer. Tr. 842-843.

A video hearing was held before ALJ Julicel Sepúlveda on December 13, 2018, and March 6, 2019. Rosado, medical expert ("ME") Dr. Rosamari Peña and vocational expert ("VE") Dr. Marieva Puig testified. Tr. 21, 442, 455-456. The date last insured considered at the time was March 31, 2014. Tr. 448.

Rosado testified[3] that she did not speak English. She finished high school and studied cosmetology for two months but did not get certified. She used to work at a major retail store, from 2003 to 2005, as an accounting assistant counting the money generated in sales at a retail store and preparing it for deposit, and part-time in customer service at a school supply from 2008 until she stopped working in October 2013 because of an injured sciatic nerve in the lumbar area. Her duties included attending the public, working on a computer and photocopier, searching for boxed items on racks, carrying them out of the warehouse with a cart, opening the boxes, and marking prices and organizing the merchandise in the store displays. The boxes were sometimes at the top of the racks, and she would have to climb to reach them. She asked but was not accommodated to work in the morning shift with lighter duties (computer work and tending to customers), so she stopped working at the school supply because lifting "extremely heavy" boxes (heavier than two gallons

---

[3] There are incongruencies between Rosado's transcribed testimony at Tr. 446-452 and her attorney's summary of Rosado's testimony at Tr. 462-464 during opening statements in the further hearing. My summary here is based on the transcription of Rosado's testimony at Tr. 446-452.

Rosado v. Commissioner of Social Security, Civil No. 20-1621 (BJM)                    12

of milk) affected her back and neck; she felt as if her back would break. If she sat for too long, her legs would fall asleep and she would feel a lot of pain. Tr. 446-448, 460-463, 465-468.

Rosado testified that from 2011 to 2013 she received physical therapy for a degenerative back condition. Tr. 469. In 2013, she was diagnosed with damage to the cervical area, an injured L4-L5 area, and carpal tunnel syndrome. She had physical therapy and was prescribed medications. "When I do the therapy, I feel an improvement. I still have pain because the pain is constant. It's just that the intensity of the pain goes down." Tr. 449. But once the therapy wore off, the pain returned. Tr. 469. The medications lowered the pain intensity, but made her dizzy, shaky, fatigued, and drowsy. Side effects would go away after two hours from intake. Tr. 451, 470, 473. She was referred to have back surgery but refused because she feared it. Tr. 470, 496. She was also given wrist bands for her carpal tunnel syndrome, which impeded her work because "I can't pick up heavy things … I don't have the strength to open a bottle nor to carry heavy things. I drop things when I carry heavy things." Tr. 450. She used a cane, not by recommendation but by her own choice, but stopped using it because she would feel pain on her right side when she exerted herself. Tr. 451-452. She did not receive psychiatric or psychological treatment from October 1, 2013, to March 31, 2014. Tr. 451.

Rosado further testified that she did household chores. She cooked and swept. She could sweep little by little due to pain. She could not wash a tub because she could not get on her knees, and her shoulders, neck, and back would hurt. If she fell, she would need help getting up. She could not lift a bucket full of water and could carry a gallon of milk at heaviest with both hands. She could drive short distances because her legs fell asleep from sitting down for too long. She went grocery shopping once a month. If she walked for an hour, she'd feel pain and a pull in her buttock area and her left leg would lock up. She'd have to sit for half-an-hour for the pain intensity to decrease. Once back home, her neighbor would help her. Rosado would put the refrigerated items away, take her medication, and lie down. Tr. 450-452, 471-473.

The ALJ expanded the period in question up to March 2015 and asked the ME if there was enough evidence to establish the severity of a mental condition from the onset date to March 2015. The ME answered no because the three INSPIRA progress notes available were from November 2018 to February 2019. Tr. 475.

The VE testified that with a date last insured of March 2014 or March 2015, Rosado was then age 42, completed high school, and worked from 2008 to 2013 a combination of customer

service clerk (semi-skilled job, SVP four, light physical exertion, Dictionary of Occupational Titles ("DOT") code 299.367-010) and stock clerk (semi-skilled job, SVP four, heavy physical exertion, DOT code 299.367-014). Rosado also worked as an accounting clerk (skilled, SVP five, sedentary physical exertion, code 216.482-010). Tr. 475-476.

The ALJ asked the VE if Rosado, with a light exertion limitation, could perform previous work in a sustainable way. She could lift and carry twenty pounds occasionally and ten pounds frequently. She could sit, stand, or walk for six hours each within a period of eight hours. She could pull, push, lift, and carry. She could frequently climb ramps and stairs, and occasionally climb ladders, ropes, and scaffolds. She could frequently balance. She could occasionally stoop, kneel, crouch, and crawl. The VE answered that Rosado could perform the customer service clerk job and the accounting clerk job. Tr. 477.

Counsel asked if Rosado could work if she were limited to lifting and carrying ten pounds occasionally and less than ten pounds frequently, and lifting, carrying, sitting, walking, and standing for no more than two hours in an eight-hour workday due to pain. The VE answered that if she could not walk, stand, or sit for two hours, she could not perform her previous jobs or any job in the work economy. "No, if the pain were that severe, and here, we're talking about the sedentary level. Well, at least six hours, she would be sitting with normal breaks. If she can't do that, no job exists in the work economy." Tr. 478. Counsel also asked if Rosado could work if she missed work one or two days a month due to her conditions. The VE answered that she would exceed the allowed absences. *Id.*

A supplemental hearing was held on September 9, 2019. The ALJ clarified that the date last insured was December 31, 2018 instead of 2014. Another ME, Dr. Jorge Hernández-Denton, testified that Rosado suffered from severe impairments (chronic cervical pain, bulging and herniated discs at the cervical spine with cord compression, L5-S1 radiculitis, herniated discs in the lumbar spine, left knee degeneration, and mild left carpal tunnel syndrome) which did not match any listing, and discussed the medical evidence. Tr. 26, 482-498. The ME compared the 2019 MRI to the 2011 MRI and noted an improvement in Rosado's back condition, testifying that "[s]he doesn't meet or equal [a listed condition], but there would still be limitations." The ME also noted that Rosado's biggest problem was her knee and that the December 2017 left knee x-ray showed arthritic changes for the first time. Tr. 492.

The ALJ noted that the medical evidence did not contain physical residual assessments by the treating physicians and that's why experts were called to testify. The ME testified that the following limitations were present as of the 2017 x-rays: she could lift ten pound occasionally and less than ten pounds frequently, sit for about six hours and stand or walk for about four hours in an eight-hour shift, frequently handle bilaterally (instead of constantly, giving benefit of the doubt that the 2011 EMG nerve conduction velocity study was negative for carpal tunnel syndrome), no limitations reaching, occasionally climb ramps and stairs but never scaffolds, frequently balance, occasionally stoop/kneel/crouch but never crawl, and never be exposed to unprotected heights because she was overweight as per her BMI, occasional exposure to moving mechanical parts, and occasionally drive short distances. Tr. 494-497. Before December 27, 2018, the ME assessed that Rosado could lift twenty pounds occasionally and ten pounds frequently, sit for about six hours and stand or walk for about six hours in an eight-hour shift, frequently climb stairs and ramps but never scaffolds. All other limitations remained the same. The ME testified that it would be reasonable to believe that this second set of residuals existed by the onset date of October 1, 2013. Tr. 498.

VE Dalila Luyanda also testified. Tr. 21, 499. The ALJ asked the VE if Rosado, with a light exertion limitation, could perform any job. Rosado could lift and carry twenty pounds occasionally and ten pounds frequently. She could sit, stand, or walk for six hours each within a period of eight hours. She could frequently perform fine motor movements with all her fingers. She could frequently climb ramps and stairs and balance, but never climb ladders, ropes, or scaffolds. She could occasionally stoop, kneel, crouch, but never crawl. She could never be exposed to unprotected heights, and could occasionally move mechanical parts and operate a motor vehicle. The VE answered that Rosado could perform the accounting clerk job. Tr. 499-500.

The ALJ then asked if Rosado could work if she were limited to a sedentary exertional level. She could lift and carry ten pounds occasionally and less than ten pounds frequently. She could sit for six hours, and stand or walk for a total of four hours. She could pull and push just as she could lift and carry. She could climb ramps and stairs occasionally. All other limitations remained the same as in the first hypothetical. The VE answered that she could perform the accounting clerk job. Tr. 500.

Counsel added that Rosado had to alternate positions every thirty minutes for a period of five to ten minutes each time, and would have to be absent from work three or four days a month,

and would have to be off-task for 20-25% of the time. The VE answered that she would not be able to work as an accounting clerk or any job in the national economy. Tr. 501-502.

On September 12, 2019, the ALJ also requested that the VE prepare a "Vocational Interrogatory." The VE answered on September 15, 2019, that Rosado had work experience within the past fifteen years as a customer service clerk (SVP 4 light), stock clerk (SVP 5 heavy), and as an accounting clerk (SVP 5 sedentary). Two hypotheticals were posed in the interrogatory, and the VE was asked to assume that the individual had Rosado's age and had her work experience, and "is ***illiterate and is able to communicate in English*** [our emphasis] as defined in 20 CFR 404.1564 and 416.964." Tr. 888. The first hypothetical question was to assume the individual had the RFC to perform less than full range of light work (light work being defined in 20 CFR 404.1567(b) and 416.967(b)), with the limitations described at the supplemental hearing. The second hypothetical question was to assume that the individual could perform less than a full range of sedentary work, as posed at the supplemental hearing. The VE answered that such an individual could perform the accounting clerk job as actually performed by the claimant or as generally performed in the national economy. The VE also answered that such an individual could perform the following unskilled occupations available in the national economy. At a light level, Rosado could work as a garment sorter (SVP 2 light with 300,000 jobs in the national economy), electronic worker (SVP 2 light with 85,000 jobs in the national economy), and mail clerk (SVP 2 light with 80,000 jobs in the national economy). On a sedentary level, Rosado could work as a document preparer (in microfiliming) (SVP 2 sedentary with 170,000 jobs in the national economy), callout operator (SVP 2 sedentary with 25,000 job in the national economy), or order clerk (SVP 2 sedentary with 40,000 jobs available in the national economy). The VE also answered that there was no conflict between the occupational evidence and the occupational information contained in the DOT and/or the SCO. Tr. 886-892.

On November 6, 2019, the ALJ found that Rosado was not disabled under sections 216(i) and 223(d) of the Act. Tr. 21-32. The ALJ sequentially found that Rosado:

(1) had not engaged in substantial gainful activity since her alleged onset date of October 1, 2013 through her date last insured of December 31, 2018 (Tr. 24);

(2) had severe impairments: degenerative disc disease of the cervical and lumbar spine, left knee sprain, and carpal tunnel syndrome (*Id*);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526) (Tr. 24-25);

(4) retained the RFC to perform less than sedentary work as defined in 20 C.F.R. 404.1567(a). Rosado could lift, carry, push, and pull ten pounds occasionally and less than ten pounds frequently. She could sit for six hours in an eight-hour workday and walk for four hours. She could bilaterally handle items and finger and feel frequently. She could occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. She could balance frequently; occasionally stoop, kneel, and crouch; but never crawl. She could never work at unprotected heights but could occasionally work with moving mechanical parts and operating a motor vehicle. Tr. 25, 27. Rosado had no past relevant work that rose to the level of substantial gainful activity as defined in 20 C.F.R. 404.1560(b)(1) (Tr. 30); and

(5) as per her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Rosado could perform (such as document preparer, call-out operator, and order clerk). Tr. 31.

The ALJ noted that "[t]he claimant is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English (20 CFR 404.1564)." Tr. 30. The ALJ also found that Rosado's depressive disorder was not a medically determinable impairment because of lack of objective evidence in the record. Tr. 24. Listings 1.02A and 1.04A for musculoskeletal impairments and Listing 11.14 for neurological issues were considered at Step Three. Tr. 25. The ALJ considered Rosado's symptoms, the objective medical evidence, and the opinion evidence in her determination, and found that Rosado's medically determinable impairments could reasonably be expected to cause her alleged symptoms but her statements concerning intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical evidence. Tr. 25-27.

The ALJ considered Rosado's RFC, age, education, and work experience in conjunction with the Medical-Vocational Rule 201.17. The ALJ explained that "[t]hrough the date last insured, if the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of 'not disabled' would be directed by Medical Vocational Rule 201.17. However, the claimant's ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations." Tr. 31. Because Rosado's ability to perform a full range of

sedentary work was impeded by additional limitations, a VE was consulted to determine the extent to which those limitations eroded the unskilled sedentary occupational base and if there existed jobs in the national economy that Rosado could perform. The ALJ added that pursuant to SSR 00-4p, the VE's testimony was consistent with the information contained in the DOT. *Id.*

The ALJ also pointed out that all evidence outside of the scope of the relevant time period (alleged onset date through date last insured) was irrelevant in assessing this case. Tr. 26.

On November 19, 2010, Rosado requested that the Appeals Council review the ALJ's decision, claiming that the RFC, the VE testimony, and the ALJ's decision were not based on substantial evidence. Tr. 752-753. Rosado specifically claimed that:

(1) "[t]he ALJ violated Social Security Ruling 00-4p and committed legal error that is not harmless at Step 5 by not resolving the apparent conflicts between the VE testimony and the Dictionary of Occupational Titles. All 3 jobs identified by the VE are in conflict with the RFC/ALJ's Decision because two jobs require 'Language Skill Level of 2' and the remaining 3rd job requires a 'Language Skill Level of 3.' This is in conflict with a claimant, as found by the ALJ, to be 'illiterate' and unable to communicate in English"; and

(2) "The ALJ did not perform a Function-by-Function analysis and did not include substantially all of the claimant's physical and mental limitations in the RFC." Tr. 753.

No additional evidence or legal arguments were submitted.

On September 18, 2020, the Appeals Council denied Rosado's request for review, finding no basis for changing the ALJ's decision, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1-5. The present complaint followed. ECF No. 1.

## DISCUSSION

This court must determine whether there is substantial evidence to support the ALJ's determination at step five in the sequential evaluation process that based on Rosado's age, education, work experience, and RFC, there was work in the national economy that she could perform, thus rendering her not disabled within the meaning of the Act.

Rosado contends that the ALJ's step-five decision is flawed because the ALJ failed to account for Rosado's inability to communicate in English. The Commissioner responded that the ability to communicate in English is no longer being considered at Step Five. ECF No. 18 at 6-7.

At Step Five, the claimant has met her burden to show that she is unable to perform past work, and the burden shifts to the Commissioner to come forward with evidence of specific jobs

in the national economy that the claimant can still perform. *Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982). The Commissioner may satisfy this burden by obtaining testimony from a VE or, where appropriate, by referencing the Medical-Vocational Guidelines ("the Grid"). *Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001). The Grid "consists of a matrix of the applicant's exertional capacity, age, education, and work experience. If the facts of the applicant's situation fit within the Grid's categories, the Grid 'directs a conclusion as to whether the individual is or is not disabled.'" *Id.* (quoting 20 C.F.R. pt. 404, subpt. P, App. 2, § 200.00(a)).

Rosado first argues that she should have been automatically found to be disabled at Step Five under Grid Rule 201.17, 20 C.F.R. Part 404, Subpt. P, App. 2, because she was 45 years old as of January 2016, the year she filed the disability claim, thus falling in the age group of 45-49 years old, is unable to communicate in English and is therefore considered illiterate, and has no past relevant work experience. ECF No. 15 at 6, ECF No. 19 at 2. Rosado reasons that communication in English is an ability acquired by "education," and education for this step five determination includes how well she can communicate in English. ECF No. 15 at p. 2; 19 at p. 2.

Rosado also argues that the VE's testimony and written interrogatory in response to the ALJ's RFC assessment and hypothetical questions were unreliable, in violation of Social Security Ruling 00-4p, thus the ALJ's ultimate decision was not supported by substantial evidence. Rosado believes that the VE's testimony regarding the national job-numbers for the three jobs she identified was faulty because it did not rest on well-accepted methodology or sources nor did the VE "cogently and thoroughly" (*quoting Biestek v. Berryhill*, 139 S. Ct. 1148, 1155 (2019)) explain her methodology for deriving at those numbers, and because it did not reflect whether the VE considered the DOT language level requirements and potential erosion in the total number of national jobs available due to her English illiteracy. ECF No. 15 at 5, 7-13.

Effective April 27, 2020, new rules govern how the Commissioner evaluates the vocational factor of education. *See* 85 Fed. Reg. 10586-10603; SSR 20-01p, 2020 WL 1285114, at *2. As of that date, a claimant is only "illiterate" if he or she "is unable to read or write a simple message in any language." *Id.* at *3; *see also id.* at *3 n.8 ("We no longer have an education category of 'inability to communicate in English' as of April 27, 2020."). SSR 20-01p further added that "[w]e will generally find that an individual who completed fourth grade or more is able to read and write a simple message and is therefore not illiterate." *Id.* at *3. Rosado is literate in Spanish and completed the eleventh grade. Because Rosado completed the 11th grade, she would no longer be

deemed "illiterate" under the Commissioner's rules, whether or not she could communicate in English. *See* SSR 20-01p, 2020 WL 1285114, at *2 ("Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education."). Grid Rule 201.17 and 20 CFR 404.1564(b)(5) were in effect at the time of the ALJ's decision in this case, dated November 6, 2019, but not by September 18, 2020, when the Appeals Council denied Rosado's request for review. I note that the Appeals Council denial contains no explanations for the denial and does not address the change in policy.

Also, in *Arce Crespo v. Secretary*, 831 F.2d 1 (1st Cir. 1987), the First Circuit took judicial notice that in Puerto Rico, the ability to communicate in Spanish, not in English, is what is vocationally relevant. The court in *Arce* reasoned that "the ALJ was justified in treating claimant's fluency in Spanish as tantamount to fluency in English." *Arce*, 831 F.2d at 6-7.  In *Figueroa-Rodríguez v. Sec'y of Health & Human Servs.*, 845 F.2d 370, 372 (1st Cir. 1988), the First Circuit noted that *Arce* "took judicial notice 'that for the most part it is the ability to communicate in Spanish, not in English, that is vocationally important in Puerto Rico.' In that case, however, a vocational expert had testified to the existence of jobs in the Puerto Rico economy that claimant could perform. The Secretary had credited that testimony and found claimant could perform the enumerated jobs. On that basis alone, the Secretary's decision denying benefits was sustainable." 845 F.2d at 372. The court in *Figueroa* went further to state that "[w]e expressly declined, however, to determine whether, had there *not* been vocational testimony and had the Secretary relied on the grid alone for a dispositive finding of no disability, the Secretary could simply have substituted Spanish for English because claimant resided in Puerto Rico." *Id.*

Upfront, I see two problems in this case regarding Rosado's English language claims and the ALJ's decision. First, 20 C.F.R. pt. 404, subpt. P, App. 2, § 201.00(h)(1), as applicable at the time of the decision, states that "a finding of 'disabled' is warranted for individuals age 45-49 who: (i) Are restricted to sedentary work, (ii) Are unskilled or have no transferable skills, (iii) Have no past relevant work or can no longer perform past relevant work, and (iv) Are unable to communicate in English, or are able to speak and understand English but are unable to read or write in English." 20 C.F.R. § 404.1454(b)(5) states that "[s]ince the ability to speak, read and understand English is generally learned or increased at school, we may consider this an educational

factor. Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language. Therefore, we consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do. It generally doesn't matter what other language a person may be fluent in."

The ALJ noted that "[t]he claimant is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English (20 CFR 404.1564)." Tr. 30. The ALJ explained: "Through the date last insured, if the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of 'not disabled' would be directed by Medical Vocational Rule 201.17. However, the claimant's ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations." Tr. 31.

Had Rosado been able to perform a full range of sedentary work, Medical Vocational Rule 201.17 would have led to a finding of "Disabled." While the ALJ might have improperly applied Grid Rule 201.17, the ALJ correctly concluded that reliance on this rule alone would be insufficient, given that Rosado's RFC was for a reduced, rather than full, range of sedentary work. Tr. 25; *see Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999) (explaining that if the Grid does not "*completely and accurately* represent a claimant's limitations," the ALJ is required to obtain and consider vocational expert testimony) (emphasis in original); *Ortiz*, 890 F.2d at 524. In that sense, the ALJ appropriately turned to VE testimony to determine whether any jobs were available in the national economy for Rosado.

The other problem I note here is that the hypothetical question posed to the VE did not contain an accurate vocational profile, specific to the then-applicable education/language factor. The ALJ is required to express a claimant's impairments in terms of work-related functions or mental activities, and a VE's testimony is relevant to the inquiry insofar as the hypothetical questions posed by the ALJ to the VE accurately reflect the claimant's functional work capacity. *Arocho*, 670 F.2d at 375.  In other words, a VE's testimony must be predicated on a supportable RFC assessment. *See* 20 C.F.R. § 404.1520(g)(1). An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.*  Also, when determining which work-related

limitations to include in the hypothetical question, the ALJ must: (1) weigh the credibility of a claimant's subjective complaints, and (2) determine what weight to assign the medical opinions and assessment of record. *See* 20 C.F.R. §§ 404.1527, 404.1529. A claimant is responsible for providing the evidence of an impairment and its severity; the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982).

The RFC ultimately adopted by the ALJ is contained in the second hypothetical question posed to VE Luyanda during the supplemental hearing held on September 9, 2019, and in the second hypothetical question of the written vocational interrogatory. I note that at the hearing, the VE was only asked about physical limitations in the hypothetical questions, that in the vocational interrogatory the VE was asked to assume that the individual had Rosado's age and had her work experience, and "is illiterate and is able to communicate in English as defined in 20 CFR 404.1564 and 416.964." (Tr. 888), and that the ALJ expressly described in the decision that Rosado "is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English (20 CFR 404.1564)." Tr. 30.

Regardless of the new rules in place regarding language, under the regulations in place at the time of the ALJ's decision, I cannot ignore the vocational profile inaccuracy in the interrogatory which may have resulted in conflict between the hypothetical question posed to the VE and the ALJ's RFC finding. It could have well been a typo in the interrogatory, but I don't know that nor if it affected the VE's opinion and therefore cannot conclude that the error was harmless.[4] While the ability to speak English is now irrelevant, "this rule change does not obviate the Commissioner's step-five burden to establish the existence of a significant number of jobs in the national economy that [Rosado] would be able to perform." *García v. Comm'r of Soc. Sec.*, 2022 U.S. Dist. LEXIS 17388 (S.D.N.Y. Jan. 31, 2022) at *43, adopted by 2022 U.S. Dist. LEXIS 60764 (S.D.N.Y., Mar. 31, 2022). Remand is therefore appropriate because "[t]he ALJ provided an incomplete hypothetical to the VE, and thus, the step five determination is not supported by substantial evidence." *Madera Colón v. Comm'r of Soc. Sec.*, No. 19-1027 (MEL), 2020 U.S. Dist. LEXIS 183162 (D.P.R. Sep. 30, 2020) at *24 (finding that the ALJ did not properly assess the claimant's English communication skills.)

---

[4] *See United States v. Scott*, 270 F.3d 30, 46 (1st Cir. 2001) ("Even if we find error, we will not reverse if the error was harmless.")

I also believe that the ALJ's finding that Rosado retained the RFC to perform less than sedentary work is supported by substantial evidence, given the plethora of evidence of her conditions and the ME's testimony, but that is not at issue here and I will therefore not discuss.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **VACATED** and **REMANDED** for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 1st day of September, 2022.

*s/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge